222 P.3d 292

Luis **BALLESTEROS** and Alma Ballesteros, husband and wife; Guadalupe Portillo; Gerardo Portillo; Ricardo Portillo; Manuel Portillo; Ruben Portillo; Guadalupe Portillo Jr.; and Patricia Yerena, Plaintiffs/Appellees,

v.

**AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN,** a foreign corporation doing business in the state of Arizona as American Family Insurance Company; American Family Mutual Insurance Company, a foreign corporation doing business in the state of Arizona; Shirlee Kopin; and Shawn D. Morris, Defendants/Appellants.

No. 2 CA–CV 2009–0123.

Court of Appeals of Arizona, Division 2, Department B.

Dec. 23, 2009.

Law Office of Elliot Glicksman, P.L.L.C. By Elliot Glicksman, and Gabroy, Rollman & Bossé, P.C. By John Gabroy and Richard Brown, Tucson, Attorneys for Plaintiffs/Appellees.

Lewis and Roca LLP By Steven J. Hulsman, Brenden J. Griffin, and Lawrence A. Kasten, Tucson, Attorneys for Defendants/Appellants.

Modrall, Sperling, Roehl, Harris & Sisk, P.A. By Brian K. Nichols, Albuquerque, NM, Attorneys for Amicus Curiae Progressive Casualty Insurance Company.

## OPINION

VÁSQUEZ, Judge.

¶ 1 American Standard Insurance Company of Wisconsin ("American Standard") appeals the trial court's grant of partial summary judgment in favor of Luis Ballesteros, his wife, and other statutory beneficiaries of decedent Manuela Portillo (collectively "Ballesteros") on their breach of contract claim arising out of an automobile insurance policy and the court's denial of American Standard's motions for partial summary judgment. Ballesteros alleged American Standard had failed to offer effectively uninsured/underinsured motorist ("UM/UIM") coverage under the policy by not providing a written offer in Spanish.

¶ 2 American Standard asserts the trial court erred in denying its motion for summary judgment, based on the court's finding it was not immune from litigation under the UM/UIM coverage statute, A.R.S. § 20–259.01. It also argues the court erred in granting Ballesteros's motion for summary judgment and concluding that, by not providing a Spanish-language form, it had failed appropriately to make available to and offer Ballesteros UM/UIM coverage. In the alternative, American Standard contends a factual dispute remains whether Ballesteros knowingly had declined UM/UIM coverage. For the reasons that follow, we affirm the trial court's denial of American Standard's mo-

tions for partial summary judgment but reverse the court's entry of partial summary judgment for Ballesteros and remand for further proceedings consistent with this decision.

## Facts and Procedural Background

¶3 We view the facts in the light most favorable to American Standard, the party against whom summary judgment was granted. *Corbett v. ManorCare of Am., Inc.*, 213 Ariz. 618, ¶2, 146 P.3d 1027, 1030–31 (App. 2006). In March 2001, Ballesteros, whose primary language is Spanish, purchased an automobile insurance policy from American Standard, doing business as American Family Insurance ("AFI"), through its insurance agent Shawn Morris. Morris had provided Ballesteros a form written only in English for the selection or rejection of UM/UIM coverage. Ballesteros signed the form, apparently indicating he had declined coverage. In September, Ballesteros's mother-in-law, an insured under the policy, was killed in a collision with an uninsured driver. Ballesteros filed a claim for UM/UIM benefits under the policy, which American Standard denied through its claims adjuster, Shirlee Kopin.

¶4 Ballesteros filed this civil action against American Standard, American Family Mutual Insurance Company (AFMIC), Kopin, and Morris, alleging breach of contract, bad faith, consumer fraud, and breach of fiduciary duty and seeking class certification pursuant to Rule 23(a) and (b)(3), Ariz. R. Civ. P.[1] After unsuccessfully attempting to remove the case to federal court, American Standard filed two motions for partial summary judgment, which the trial court denied. The court also denied the defendants' motion for reconsideration, and this court declined special action jurisdiction. The trial court subsequently denied Ballesteros's request for class certification.

¶5 Ballesteros moved for partial summary judgment on the "legal issue of whether Defendant [American Standard] violated ... § 20–259.01 by presenting [him] with an English-language form offering [UM/UIM] cov-

erage ... and failing to provide him with a Spanish-language form." The trial court granted the motion, finding American Standard had not "establish[ed] by appropriate evidence that the notice offered to Mr. Ballesteros was reasonably calculated to bring to his attention that which was being offered" because it had not provided him a Spanish-language form. The court entered judgment on Ballesteros's breach of contract claim in the amount of $50,499 and included the requisite language pursuant to Rule 54(b), Ariz. R. Civ. P., certifying its judgment as a final, appealable order. American Standard timely filed a notice of appeal. This court has jurisdiction pursuant to A.R.S. § 12–2101(B).

## Standard of Review

¶6 Whether summary judgment is appropriate is a question of law we review de novo. *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 191, 888 P.2d 1375, 1378 (App. 1994). We will affirm a grant of summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c); *see also Orme Sch. v. Reeves*, 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). And, although the denial of a motion for summary judgment is generally a nonappealable interlocutory order, we may consider such denials when we otherwise have jurisdiction over the appeal, as we do here. *In re 1996 Nissan Sentra*, 201 Ariz. 114, ¶16, 32 P.3d 39, 44 (App.2001).

## Discussion

### I. Application of Safe Harbor

¶7 The central issue in this case involves the interpretation of § 29–259.01. That statute provides, in pertinent part:

Every insurer writing automobile liability or motor vehicle liability policies shall make available to the named insured ... and by written notice offer the insured ... uninsured [and underinsured] motorist coverage which extends to and covers all persons insured under the policy.... The

1. Although not initially a party to the lawsuit, Ballesteros added AFMIC as a defendant in his

fourth amended complaint.

selection of limits or rejection of coverage by a named insured or applicant on a form approved by the director is valid for all insureds under the policy.

On appeal, American Standard argues the plain language of the second sentence of this statute, which was added in 1992, 1992 Ariz. Sess. Laws, ch. 147, § 1, provides a "safe harbor" for insurers, insulating them from litigation. It maintains "that if a customer declines an offer of UM/UIM coverage by signing a [Department of Insurance ("DOI") ]-approved form," then that decision "is valid," and it asserts it followed this "bright line, safe harbor procedure by making its written offer to ... Ballesteros using a form the DOI had reviewed, modified, and approved." Thus, American Standard contends that in denying its motion for summary judgment and rejecting the safe harbor, "the [trial] court acted contrary to the statute's plain language as previously interpreted by this Court and the Supreme Court, and to the statute's legislative history."

¶ 8 In his complaint and subsequent filings below, Ballesteros had asserted that "because of [American Standard]'s failure to provide [him] with a written offer for selection/rejection of UM and UIM coverage in Spanish, [he was] deemed to have UM and UIM coverage up to the amount of the[ ] liability coverage." American Standard moved for summary judgment on this claim, relying, in part, on what it asserted was the safe harbor language in § 20–259.01. The trial court denied the motion, concluding, "It is the purp[os]e of the statute to guarantee the opportunity for responsible drivers to protect themselves and their loved ones through the purchase of UM/UIM coverage." And, it concluded, the case law interpreting § 20–259.01 "does not ... stand for the proposition that an insurer can provide a primarily Spanish speaking and reading applicant with an offer written in English without more. This court finds that there is no 'safe

harbor' under these circumstances." The trial court later denied the defendants' motion for reconsideration on the same grounds.

¶ 9 Preliminarily, we address American Standard's contention that "this court and the [Arizona] Supreme Court have already concluded [the statute] create[s] a safe harbor ... when a DOI-approved form is used." As support for this argument, American Standard relies on *Tallent v. National General Insurance Co.*, 183 Ariz. 304, 310, 903 P.2d 612, 618 (App.1995)(*Tallent I* ), decided by Division One of this court, and the supreme court's opinion vacating and reversing that decision in *Tallent v. National General Insurance Co.*, 185 Ariz. 266, 915 P.2d 665 (1996)(*Tallent II* ). Although instructive, we do not find those cases have the dispositive weight American Standard ascribes to them. The supreme court vacated *Tallent I* in its entirety and did not adopt its "safe harbor" language in *Tallent II;* that language therefore does not govern our analysis.[2] And in *Tallent II* the supreme court said only that "[p]erhaps questions [challenging the sufficiency of offers for UM/UIM coverage] will not arise in the future because the law now provides that '[t]he selection of limits or the rejection of coverage by a named insured ... on a form approved by the ... [DOI] shall be valid for all insureds.'" 185 Ariz. at 267 n. 2, 915 P.2d at 666 n. 2 (second alteration in *Tallent II* ), *quoting* § 20–259.01(B). This language does not support American Standard's assertion that the courts have concluded a "safe harbor" exists under § 20–259.01. We need not reach this issue, however, because even assuming, without deciding, a safe harbor generally exists, we would conclude it is not absolute and does not apply under the circumstances presented here.

¶ 10 "Our primary task in interpreting statutes is to give effect to the intent of the legislature." *In re Estate of Winn,*

---

**2.** In *Tallent I*, the court commented:

> The 1992 amendment and the approved selection form reflect the legislature's continuing concern for protecting responsible drivers and their passengers from financially irresponsible drivers. We believe the legislature, in amending the statute and creating a "safe harbor" for insurers, confirmed that more is needed to

> effectively offer UIM coverage than a form containing a box marked "underinsured motorist coverage" for the insured to mark if such coverage is desired.

183 Ariz. at 310, 903 P.2d at 618. As noted, however, the "safe harbor" language was not adopted by the supreme court in *Tallent I.*

214 Ariz. 149, ¶ 8, 150 P.3d 236, 238 (2007). "The first step is to examine the statute's language and, if the meaning of the language used by the legislature is plain, that meaning controls the statute's application." *Calnimptewa v. Flagstaff Police Dep't*, 200 Ariz. 567, ¶ 10, 30 P.3d 634, 636 (App.2001). If, however, the language is ambiguous or unclear, we also consider "the policy behind the statute and the evil which it was designed to remedy ... [and] the ... context, subject matter, and effects and consequences of the statute." *Calvert v. Farmers Ins. Co. of Ariz.*, 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985). Additionally, we may look to the statute's legislative history. *Weekly v. City of Mesa*, 181 Ariz. 159, 163, 888 P.2d 1346, 1350 (App. 1994).

¶ 11 Both in this court and below, the parties have argued extensively about whether the second sentence of § 20–259.01, quoted above, constitutes a safe harbor that insulates insurers from liability when an insured signs an approved form. Contrary to American Standard's argument, however, the plain meaning of this sentence is not apparent from the face of the statute. Although it is susceptible to the meaning American Standard ascribes to it, it is also susceptible to Ballesteros's interpretation, which is that the legislature "merely meant to require that, in order to bind all insureds under the policy, the selection or rejection of these coverages [must] be memorialized on a form approved by the DOI." Because the statute is reasonably susceptible to more than one meaning, it is ambiguous and we must therefore look beyond the statute's wording to determine its meaning. *See Calvert*, 144 Ariz. at 294, 697 P.2d at 687.

¶ 12 American Standard argues basic contract principles provide that contracting parties are presumed to know what they are signing, and Ballesteros cannot now argue he was unaware of what the DOI-approved offer form contained. However, insurance policies are special agreements, and our courts have declined to apply this maxim rigidly in the area of UM/UIM coverage. *See, e.g., Giley v. Liberty Mut. Fire Ins. Co.*, 168 Ariz. 306, 812 P.2d 1124 (App.1991). "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, ¶ 20, 995 P.2d 276, 280 (2000), *quoting Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986). And Arizona has a "long-standing legislative policy to guarantee all insureds protection against uninsured motorists." *Employers Mut. Cas. Co. v. McKeon*, 159 Ariz. 111, 114, 765 P.2d 513, 516 (1988).

¶ 13 "[T]he purpose of the Uninsured Motorist Act is 'to guarantee that responsible drivers will have an opportunity to protect themselves and their loved ones as they would others.'" *Estate of Ball v. Am. Motorists Ins. Co.*, 181 Ariz. 124, 127, 888 P.2d 1311, 1314 (1995), *quoting Ormsbee v. Allstate Ins. Co.*, 176 Ariz. 109, 112, 859 P.2d 732, 735 (1993); *see also Spain v. Valley Forge Ins. Co.*, 152 Ariz. 189, 192, 731 P.2d 84, 87 (1986) (legislature has "strong commitment to ... allow those with foresight to protect themselves and their passengers with [UM] coverage"). Our UM/UIM statutes are considered "remedial, and should be liberally construed in order to carry out the intent of the Legislature ... to afford protection to victims of financially irresponsible drivers." *Calvert*, 144 Ariz. at 294, 697 P.2d at 687 (citations omitted); *see Taylor v. Travelers Indem. Co. of Am.*, 198 Ariz. 310, ¶ 11, 9 P.3d 1049, 1053 (2000). Thus, we consider the statute's mandated written offer of coverage to be the expression of the legislature's intent to protect responsible members of the public from financially irresponsible drivers. *St. Paul Fire & Marine Ins. Co. v. Gilmore*, 168 Ariz. 159, 165–66, 812 P.2d 977, 983–84 (1991). And as the main expression of that intent, we will not interpret the statute, including assessing the sufficiency of an offer, in a way that conflicts with the legislature's intent to provide protection from uninsured and underinsured motorists. *See Calvert*, 144 Ariz. at 294, 697 P.2d at 687.

¶ 14 Against the backdrop of Arizona's strong policy favoring UM/UIM coverage, the statutory language concerning the offer of UM/UIM coverage has been litigated extensively in our courts. In 1991 this court

decided *Giley*. 168 Ariz. 306, 812 P.2d 1124. There, the insurance agent had described to Giley uninsured motorist coverage but not underinsured coverage. *Id.* at 306, 812 P.2d at 1124. The agent then offered Giley a form and told her to sign it if she "wanted coverage." Unbeknownst to Giley, the form included a written offer of underinsured coverage, and the agent retained the form after Giley signed it, apparently indicating she had declined UIM coverage. *Id.* When she later sued the insurer for its failure to provide notice of UIM coverage, the trial court granted the insurer's motion for summary judgment on the ground that the statute required only a written offer of coverage, which she had received, and that no action had been taken to prevent her from reading the form she had been given. *Id.* On appeal, this court reversed, concluding § 20–259.01 "requires that the insurer offer such coverage in a way reasonably calculated to bring to the insured's attention that which is being offered." *Id.* We thus found questions of fact remained whether the agent's behavior constituted "conduct likely to prevent Ms. Giley from reading the form" and that a reasonable trier of fact therefore could conclude the agent had failed appropriately to make the offer of UIM coverage available. *Id.* at 306–07, 812 P.2d at 1124–25.

¶ 15 The breadth of *Giley's* holding was litigated a few years later in *Tallent I* and *Tallent II*. There, the insured had purchased a policy from National General Insurance (National). *Tallent II*, 185 Ariz. at 266, 915 P.2d at 665. After she was injured in a car accident, Tallent filed a claim for $100,000 under the UIM provision of her policy, although her policy stated she had purchased only $15,000 in UIM coverage. *Id.* National denied the claim for amounts over $15,000, and Tallent sued, contending she never had received an offer of UIM coverage pursuant to § 20–259.01, and that, in any event, National's offer form failed to comply with the statute. *Id.* at 266–67, 915 P.2d at 665–66. The trial court found National's offer form insufficient as a matter of law and granted summary judgment in Tallent's favor. *Id.* at 267, 915 P.2d at 666. A divided court of appeals affirmed, concluding the offer was deficient because it did not

provide a written explanation of the coverage, as the court believed *Giley* required. *Id.; Tallent I*, 183 Ariz. at 310, 903 P.2d at 618.

¶ 16 The supreme court reversed. It determined that the plain language of the statute required only an offer, which is an unambiguous legal term, and that mailing the document containing the offer and coverage options to the insured conveyed the offer "'in a way reasonably calculated to bring to the insured's attention that which is being offered.'" *Tallent II*, 185 Ariz. at 267–68, 915 P.2d at 666–67, *quoting Giley*, 168 Ariz. at 306, 812 P.2d at 1124. In its opinion, the court stated that explanations are "unwise" because they "would inevitably lead to claims that insurers had inadequately explained all the ramifications of [UM/]UIM coverage or the lack thereof calling for yet further explanations." *Id.* at 268, 915 P.2d at 667. It noted, however, that "National's form certainly seems sufficient to cause any insured or potential insured who has questions about the meaning of UM or UIM coverages to ask for an explanation." *Id.* The court then vacated the court of appeals' decision and remanded for a factual determination of whether National actually had sent Tallent the notice of UM coverage. *Id.*

¶ 17 In *Tallent II*, our supreme court rejected any suggestion that *Giley* imposed a burden on insurers to explain UM/UIM coverage in writing as part of its offer form. However, the court did not reject *Giley's* central holding that to "make available and by written notice offer" coverage, as required by § 20–259.01, an insurer must convey the offer "in a way reasonably calculated to bring to the insured's attention that which is being offered." *Giley*, 168 Ariz. at 306, 812 P.2d at 1124. Thus, even after *Tallent II*, although an insurer had no obligation to explain the coverage being offered, it remained obligated to communicate effectively the offer of UM/UIM coverage to the insured. We recognize, as we have stated, *Tallent II* did not address directly the effect of the purported "safe harbor" language, if any, on *Giley's* continued relevance in interpreting the statute's language. But we reject American Standard's contention *Tallent II* stands for the

proposition that an insurer can fulfill its obligation to communicate effectively the offer solely by obtaining a signature on a form when it knew or reasonably should have known the insured could not read it.

¶ 18 As noted above, § 20–259.01 was amended in 1992, after this court decided *Giley*, to include the "safe harbor" language under consideration.[3] 1992 Ariz. Sess. Laws, ch. 147, § 1. It provides: "The selection of limits or rejection of coverage by a named insured or applicant on a form approved by the director is valid for all insureds under the policy." § 20–259.01(A), (B). We find nothing in this amendment or its history to suggest this language was added for the purpose of invalidating *Giley's* requirement that offers be provided in a way reasonably calculated to apprise the insured of their contents. If we assume, again without deciding, the amendment did create a "safe harbor," we agree with American Standard that conditioning that harbor upon the use of an approved form was intended to "protect consumer rights" and provide "an effective buffer against insurers using unsatisfactory forms." DOI approval generally will ensure that the offer form is sufficient to notify the insured that UM/UIM coverage is being offered.

¶ 19 We disagree with American Standard that legislative history demonstrates that the legislature's "overriding intent was specifically to create a safe harbor that would preclude disputes like this one, so long as an insurer has used a DOI-approved form." The legislative history cited by American Standard includes a Senate Memo and Fact Sheet and the minutes of the floor debate of this amendment. But the fact sheet suggests only that this language was added to § 20–259.01 "to clarify an acceptable procedure for the offering of" UM/UIM coverage to potential insureds in light of this court's holding in *Giley*. *See In re Waldren*, 217 Ariz. 173, ¶ 15, 171 P.3d 1214, 1217 (2007) (considering senate fact sheet as evidence of intent); *Lubin v. Thomas*, 213 Ariz. 496, ¶ 16, 144 P.3d 510, 512 (2006) (same).

¶ 20 The floor debate minutes also suggest the amendment was intended to "specify exactly how" an offer of UM/UIM coverage "should be made available." They also refer to what appears to be the *Giley* opinion. The minutes suggest, "This amendment puts in [the] statute that the insurance agent can use a form approved by the Director of the Department of Insurance to satisfy the requirement" that coverage be explained. The remainder of the committee minutes overwhelmingly consists of summaries of statements of nonlegislators. Such statements generally "are not persuasive evidence of legislative intent 'unless the circumstances provide sufficient guarantees that the statements reflect legislators' · views.'" *Douglas v. Governing Bd. of Window Rock Consol. Sch. Dist. No. 8*, 206 Ariz. 344, n. 3, 78 P.3d 1065, 1068 n. 3 (App.2003), *quoting Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 270, 872 P.2d 668, 674 (1994). We do not find such indicia of reliability here. The minutes reflect that after the nonlegislators had spoken about the bill, "extensive discussions followed," but those discussions were neither reported nor summarized. However, one legislator did state he believed that "a uniform form would go a long way in helping establish that the coverage was offered."

¶ 21 American Standard also suggests we defer to the reasonable interpretation of the DOI concerning the "safe harbor" language. American Standard is generally correct that we accord " 'considerable weight ... to an executive department's construction of a statutory scheme it is entrusted to administer.'" *Ariz. Water Co. v. Ariz. Dep't of Water Res.*, 208 Ariz. 147, ¶ 30, 91 P.3d 990, 997 (2004), *quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). American Standard cites to two circular letters and the declarations of two prior DOI directors as evidence of the agency's interpretation of § 20–259.01. The circular letter issued immediately after the amendment was passed clearly states that it

---

**3.** Although *Tallent II* was decided after the statute had been amended, it considered the version of the statute that was in effect in 1988, when Tallent purchased her policy. 185 Ariz. at 266, 915 P.2d at 665.

is not intended to be either an exhaustive listing or detailed legal analysis of the insurance bills that became law. Rather, the intent is to describe the main areas where substantive changes in insurance statutory requirements have taken place. This synopsis should not be considered a legal opinion or otherwise binding interpretation of the legislation.

And, in discussing the amendment to § 20–259.01, the circular states, as did the Senate memo sheet, that the language "clarifies the requirements imposed on insurers" and "establishes an acceptable procedure for the offering of these types of coverages."

¶ 22 The second circular letter, issued in 1994, states more clearly that its purpose "is to inform insurers that the attached form may be used ... for the purpose of satisfying the requirements of ... § 20–259.01." And, as American Standard asserts, the declarations of the two prior DOI directors do indicate that their agency had interpreted DOI-approval of an insurer's notice form as being "conclusive as to the statutory compliance of the notice's format and content." But American Standard's reliance on this evidence misses the point.

■■■ ¶ 23 The issue here is not whether the specific contents of the form offered to Ballesteros contained the appropriate information. There is no dispute that the offer American Standard used had been approved by the DOI as to content and form. The issue, rather, is whether the offer was provided to Ballesteros in a way that reasonably could apprise him of what it contained. Neither the legislative nor regulatory histories speak to that issue. Furthermore, we generally only defer to an agency's interpretation of a statute in "circumstances ... in which the legislature has not spoken definitively to the issue at hand." *Ariz. Water Co.*, 208 Ariz. 147, ¶ 30, 91 P.3d at 997. And, even though the legislature has not addressed this precise issue directly, it has indicated a strong intent to provide "those with foresight" the opportunity to "protect themselves and their passengers with [UM/UIM] coverage." *Spain*, 152 Ariz. at 192, 731 P.2d at 87. Considering this long-standing public policy

in favor of such coverage, we do not find the DOI's interpretation of § 20–259.01 controlling.

¶ 24 After considering the legislative history and agency interpretation of § 20–259.01, we find nothing to suggest the legislature intended to overrule *Giley's* basic holding that offers must be provided to a potential insured in a way "reasonably calculated" to apprise the insured of what is being offered. In fact, the language of the Senate fact sheet suggests an accommodation of that holding. The evidence American Standard has provided fails to demonstrate that when the legislature enacted this amendment it intended statutory compliance to serve as a bar to any and all challenges to an offer of coverage, regardless of the circumstances. And the one senator's remark mentioned above indicates only that he believed this language would reduce litigation about whether an offer had been provided, not preclude it.

¶ 25 We agree the statute's language can reasonably be interpreted to mean that by obtaining an insured's signature on a DOI-approved form, an insurer facially has complied with the offer requirement under the statute. In most instances nothing more is required. But, when the insurer knew or should have known that merely providing the offer form would be insufficient to convey the offer of coverage to the potential insured because the insured could not read it, the insurer must take additional steps reasonably calculated to ensure the offer is communicated effectively to the insured. This conclusion is in accord with our state's long-standing policy regarding UM/UIM coverage and our interpretation of this remedial statute in favor of coverage. It is also consistent with this court's holding in *Giley*, which requires the insurer to provide the offer to the insured "in a way reasonably calculated to bring to the insured's attention that which is being offered." 168 Ariz. at 306, 812 P.2d at 1124.

¶ 26 Here, the insurer knew Ballesteros primarily spoke Spanish, yet it provided him with a form written entirely in English with-

out translating its contents into Spanish.[4] Under these circumstances, providing the written offer cannot be said to have been "reasonably calculated to bring to [Ballesteros's] attention that which [wa]s being offered." *See id.* American Standard therefore is not insulated from litigation by its use of the DOI-approved form. Something more was required to demonstrate American Standard had complied with the requirements of § 20–259.01. The trial court thus did not err in finding that no safe harbor existed under these circumstances and questions of fact remain about whether American Standard had complied with the statute's offer requirement. American Standard therefore was not entitled to judgment as a matter of law. *See Orme Sch. v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990).

## II. Spanish–Language Form

¶ 27 Next, American Standard contends the trial court erred in finding that "in order for a written offer of UM/UIM coverage to a Spanish-speaking insured to comply with ... § 20–259.01, the offer must be written in the Spanish language." As its basis for concluding that a Spanish-language form must be supplied, the court cited *Tallent II* and *Estate of Ball v. American Motorists Insurance Co.,* 181 Ariz. 124, 128, 888 P.2d 1311, 1315 (1995), for the proposition that "[q]uestions of state of mind, whether oral explanation of the offer was provided, and what defendants knew about the applicant's ability to read English or prior experience buying insurance are irrelevant" in assessing whether transmission of an offer complied with § 20–259.01. However, neither case has so held. As noted above, *Tallent* only held that no written explanation was required to satisfy the requirements of the statute; it did not address the situation in which the insurer is aware the potential insured cannot understand the offer. And although *Estate of Ball*

referred to a "bright line rule" in § 20–259.01, the issue in that case was the bright-line requirement that the offer be in writing. 181 Ariz. at 125, 128, 888 P.2d at 1312, 1315. The court there said nothing about an insurer's obligation to offer coverage to an insured in a way "reasonably calculated" to apprise the insured of the offer's contents.

¶ 28 We agree with American Standard that it was not required to offer Ballesteros a Spanish-language form to satisfy § 20–259.01. Nothing in the statute or the case law interpreting it requires an offer to be in an insured's primary or preferred language, and as American Standard notes, the legislature has proven itself quite capable of inserting Spanish-language requirements in other statutes. *See, e.g.,* A.R.S. § 49–542.03(B). "Where the legislature uses a term within one statute and excludes it from another, the term usually will not be read into the provision from which it was excluded." *City of Flagstaff v. Mangum,* 164 Ariz. 395, 398, 793 P.2d 548, 551 (1990). Under the UM/UIM statute, an insurer is required only to convey the offer in a way reasonably calculated to apprise the potential insured of its contents. *See Giley,* 168 Ariz. at 306, 812 P.2d at 1124. Thus, when an insurance agent knows or has reason to know that the DOI-approved form, standing alone, does not do so, he or she is required to take action reasonably calculated to inform the insured of the written offer's contents.

## III. Ballesteros's Motion for Summary Judgment

¶ 29 Finally, American Standard contends the trial court erred in granting Ballesteros's motion for summary judgment because questions of fact exist whether its agents had explained the English form to Ballesteros in Spanish and whether he could understand the English form as written.[5]

---

4. Whether a Spanish explanation actually was provided is a disputed issue of fact. However, for purposes of summary judgment and determining whether American Standard is protected by a safe harbor, it has conceded no Spanish explanation was provided.

5. Ballesteros contends American Standard has waived this argument because it "is completely

undeveloped and unsupported by citation to authority." We disagree. The argument complies with Rule 13(a)(6), Ariz. R. Civ.App. P. In any event, given our resolution of the other issues in this case, we would be required to reach this issue regardless, to dispose of the issues raised in this case.

We agree. In the proceedings below, American Standard produced evidence that Ballesteros had lived in the United States for more than twenty years, had attended some English classes, knew how to ask for help, and routinely did so, in filling out English-language documents he could not understand, generally paid his bills written in English without assistance, and previously had received explanations of automobile coverage in Spanish before purchasing the coverage at issue in this case. Ballesteros also testified at his deposition that a Spanish-speaking woman had helped him on the day he purchased the policy from American Standard and at the time he thought she was "trying to help [him] understand" the available policies. And, American Standard provided declarations from two of the insurance agent's Spanish-speaking employees, who stated it was their practice to translate and explain the offer form for Spanish-speaking insureds and they would have followed this practice in dealing with Ballesteros. A jury could find such evidence sufficient to establish American Standard had made the offer in a manner reasonably calculated to communicate it effectively to Ballesteros.

¶ 30 However, there was also evidence in the record that despite the length of time he had lived in the United States and his English classes, Ballesteros spoke very little English and could not understand and complete English documents without the assistance of a Spanish translation or explanation. He further testified at his deposition that although American Standard's employees tried to explain many things about insurance policies to him, one thing they did not explain or offer to him was UM/UIM coverage.

¶ 31 There clearly exists a factual dispute as to what steps American Standard took, beyond merely providing an English-language form, to convey the offer of UM/UIM coverage to Ballesteros and comply with § 20–259.01. When there are genuine issues of material fact, summary judgment is inappropriate. *Orme Sch.*, 166 Ariz. at 305, 802 P.2d at 1004; Ariz. R. Civ. P. 56(c). We therefore conclude the trial court erred in granting Ballesteros's motion for summary judgment.

## IV. Attorney Fees

¶ 32 Both parties have requested their attorney fees on appeal pursuant to A.R.S. § 12–341.01(A). In our discretion, we deny both requests. *Orfaly v. Tucson Symphony Soc'y*, 209 Ariz. 260, ¶ 28, 99 P.3d 1030, 1037 (App.2004).

## Disposition

¶ 33 For the reasons stated above, we affirm the trial court's denial of American Standard's motion for summary judgment because, even assuming a safe harbor exists in § 20–259.01, it is not available to American Standard under the facts presented in this case. However, the court erred in concluding that § 20–259.01 requires the use of a Spanish-language offer form when a potential insured is a Spanish speaker and that, on that basis, Ballesteros was entitled to summary judgment. Finally, because genuine issues of material fact exist whether American Standard reasonably conveyed the offer of UM/UIM coverage to Ballesteros, we remand for further proceedings consistent with this opinion.

CONCURRING: PETER J. ECKERSTROM, Presiding Judge and J. WILLIAM BRAMMER, JR., Judge.